# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 6967 | **DATE** | 7/16/2002 |
| **CASE TITLE** | Jean Sizer vs. Rossi Contractors, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 8/7/02 at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court orders remittitur of the damages awarded to $25,000. Within 21 days, Plaintiff is directed to advise the court and Defendant of her willingness to accept the reduced amount; if she declines, the court will conduct a new trial at the next available trial setting. A status conference is set for Wednesday, August 7, 2002, at 9:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 3 number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JUL 17 2002 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 7/16/2002 date mailed notice | |
| ETV | courtroom deputy's initials | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DOCKETED
JUL 17 2002

| | |
|---|---|
| JEAN SIZER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 98 C 6967 |
| ROSSI CONTRACTORS, LOCAL 731 TEAMSTERS 5, ANGELO ROSSI, RONALD ROSSI and TERRY HANCOCK, | ) Judge Rebecca R. Pallmeyer ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jean Sizer brought this suit against her former employer, Defendant Rossi Contractors, charging Rossi with sex discrimination and intentional infliction of emotional distress. Following a short trial, the jury returned a verdict in favor of Defendant on Plaintiff's Title VII gender discrimination claim, but initially failed to complete a second verdict form on Plaintiff's Illinois state law claim of intentional infliction of emotional distress. After reviewing the verdict on Count I, the court promptly instructed the jury to return to the jury room and complete its deliberations on the remaining claim. Within a few minutes, the jury returned, this time with a verdict in favor of Plaintiff on the intentional infliction of emotional distress claim and an award of $125,000 in damages. Plaintiff has moved the court to enter judgment on that verdict, while Defendant moves for judgment on Count II as a matter of law, arguing that the jury's verdict was unsupported by the evidence and inconsistent. Plaintiff points out that Defendant did not move for judgment as a matter of law with respect to Count II before the case was submitted to the jury, and argues that the motion is, therefore, waived. While the record supports Plaintiff's waiver argument, the court, nonetheless, has grave concerns about the adequacy of the evidence to support the jury's award. Accordingly, for the reasons explained below, the court will reduce the damages to $25,000 or, in the alternative, order a new trial.

## FACTUAL BACKGROUND

Although the jury returned a mixed verdict, for purposes of this analysis, the court reviews the evidence in the light most favorable to Plaintiff. Plaintiff testified at trial that she began working for Defendant as a semi dump truck driver in March of 1993, and that she was terminated from that position in April of 1995. (Trial Transcript ("Tr.") pp. 3-5.) Plaintiff explained that she was terminated because she received her "third strike" when she failed to show up for work, and had not previously called in to report that she would be absent. (Tr. p. 5.)

Plaintiff acknowledged that Defendant had issued warning notices for infractions of company policy on two prior occasions. (Tr. p. 5). Defendant issued the first warning in November of 1994, imposing a one-day suspension for disobeying an order to continue working which resulted in a "work stoppage."[1] (Tr. p. 6-7.) Plaintiff admitted on cross-examination that she did disobey the work order, noting that she did so because she had worked for more than eight hours without lunch. (Tr. p. 32.) She testified that two fellow drivers, both male, also refused to continue working despite the order to do so and asserts that neither of the male drivers was disciplined or issued warning notices. (Tr. p. 6.) Plaintiff contacted the local union representative, Terry Hancock, to file a grievance, but he informed her that she was not a union member. (Tr. p. 7.)

Plaintiff's second warning notice came in March of 1995. (Tr. p. 7.) Defendant issued this warning notice after Plaintiff broke a utility pole while driving her truck in reverse. (Tr. p. 8.) Plaintiff explained that she was reversing the truck along a "makeshift road" that was narrow and elevated twelve to fourteen feet when her exhaust pipe caught a wire that snapped the pole. (Tr. p. 8.) Plaintiff herself reported the incident, which resulted in her second warning notice. (Tr. p. 9.)

The second warning was followed shortly by the third and final disciplinary notice, resulting

---

[1] It is not clear from the record which individual actually gave Plaintiff this warning.

2

in Plaintiff's termination. (Tr. p. 10.) Plaintiff testified that on Friday, March 31, Ronald Rossi told her that she was scheduled to work the next day, Saturday, April 1, 1995. (Tr. p. 10.) Plaintiff testified that, at that time, she asked Ronald Rossi for the day off because she had lost title to her house in foreclosure proceedings and she needed to move her things out that night which would leave her "too fatigued . . . to be a safe driver" the following day. (Tr. pp. 10-11.) Ronald Rossi refused Plaintiff's request for the day off on April 1, 1995, although Plaintiff acknowledged on cross-examination that he had given her time off when she requested it on earlier occasions. (Tr. pp. 11, 35.)

Plaintiff was expected to have her vehicle operational and on the road by 7:00 a.m. on April 1, but she did not finish moving her belongings until 2:30 or 3:00 a.m. that morning. (Tr. p. 12.) She slept until 7:00 a.m., but then "jumped up and called Rossi Contractors." (Tr. p. 12.) She testified that the phone rang some ten times without an answer. Plaintiff then called back again, and let it ring about twenty times, but still there was no answer from Rossi. (Tr. p. 12.) Apparently concerned about her own telephone, Plaintiff called her friend, Arva Abbott, who has three-way calling, and asked Abbott to call Defendant. Again, the phone rang repeatedly without anyone answering it. (Tr. p. 12-13.) At around 7:20 a.m., Plaintiff telephoned a co-worker, Terry Norris, to see if he could get through to Defendant, but Norris fared no better. (Tr. p. 15.) Plaintiff did not go to work at any time on April 1, 1995. The following Monday, April 3, 1995, Plaintiff called Defendant to ask for that day off because she "was fatigued and . . . couldn't do [her] best driving."[2] (Tr. p. 15.) At that time, Ronald Rossi told Plaintiff that her employment was terminated. (Tr. p. 16.) Plaintiff testified that she believed she was terminated "in part because [she was] a woman." (Tr. p. 16.) On cross examination, Plaintiff acknowledged that she had been aware, since at least the time of her first warning in November of 1994, of Rossi's progressive discipline policy under

---

[2] It is not clear at what time Plaintiff called Ronald Rossi, nor is it clear whether she was assigned to work on April 3, 1995.

3

which a driver who received three warnings in one 12-month period could be terminated. (Tr. p. 32.)

In addition to the warning notices she received leading to her termination, Plaintiff highlighted a number of examples of Defendant's unfair conduct towards her. Plaintiff testified that, over the course of her employment, Defendant "would work male drivers with less seniority" and not work her, and that this "crushed" her financially. (Tr. pp. 17, 24.) Plaintiff also found out after the fact that at least some of her coworkers had been assigned to work on snow removal at O'Hare over the winter. (Tr. p. 24.) Plaintiff also said that the truck she was assigned to drive during 1993 and part of 1994 had bad brakes. (Tr. p. 17-18.) Drivers were expected to write any requests for truck maintenance on the back of their timecards. (Tr. p. 17.) Plaintiff explained that she followed this practice on most days, repeating her request that the truck's brakes be repaired, but testified that, to her knowledge, no such repairs were made. (Tr. p. 18.) On cross-examination, Plaintiff acknowledged that she was transferred to a brand new truck, and that a man with less seniority was assigned to drive the truck she had been driving.[3] (Tr. pp. 30-31.)

Plaintiff also explained that she had some disputes with Defendant over compensation and benefits. Plaintiff testified that, to her knowledge, Defendant had not paid any health and welfare benefits on her behalf to the union. (Tr. p. 19-20.) She also testified, however, that she never technically became a member of Local 731, although she believed she had.[4] (Tr. p. 19.) Plaintiff testified that on one occasion Local 731 represented her in a grievance with Defendant over holiday pay,[5] and on another occasion represented her and six other coworkers in a grievance over holiday

---

[3] It is not clear when this truck reassignment occurred.

[4] Plaintiff did not explain what steps, if any, she undertook to become a union member, nor did she explain what led her to believe that she was a union member.

[5] It is not clear to the court why the union represented her in this grievance if she was not a union member. The date and outcome of this grievance are not identified in the record.

4

and overtime pay. (Tr. p. 20.) Although Plaintiff and her coworkers "won" that grievance, Plaintiff claimed she did not receive any of the compensation to which she was entitled. (Tr. p. 20.) Plaintiff admitted on cross-examination that in return for a letter of recommendation signed by Ronald Rossi stating that Plaintiff was a conscientious employee, she withdrew one of her grievances (the parties did not identify which one) over holiday pay. (Tr. p. 31.) On cross-examination, Plaintiff acknowledged that she was never denied holiday pay on the basis of her sex. (Tr. p. 32.)

When asked how her termination by Defendant affected her, Plaintiff explained that she was "totally disillusioned," "devastated," "depressed," in "despair," and "scared to go out and get a job hooked to a union." (Tr. p. 24.) She also acknowledged on cross-examination, however, that she experienced a great deal of stress related to the foreclosure on her house, which was initiated long before her termination from Defendant. (Tr. p. 39-40.)

## DISCUSSION

As previously noted, the jury initially returned a verdict in favor of Defendant on Plaintiff's sex discrimination claim. After the court directed the jurors to complete the verdict concerning Plaintiff's claim of intentional infliction of emotional distress, the jurors found in favor of Plaintiff on that claim and awarded her $125,000 in damages. Plaintiff seeks judgment on the verdict, while Defendant vigorously argues it is not supported by the evidence. Before addressing the merits of this argument, the court pauses to consider Plaintiff's waiver argument and Defendant's contention that the jury's verdict is inconsistent.

**Waiver**

Plaintiff argues that Defendant has waived its motion for judgment as a matter of law on Count II by failing to make a Rule 50(a) motion at the close of the evidence, prior to the case being submitted to the jury. Having reviewed the record with care, the court agrees. Defendant

5

undoubtedly made a Rule 50(a) motion with respect to the sex discrimination claim. Neither Defendant's written motion nor the arguments made to the court make any reference to Plaintiff's emotional distress claim, however. Rule 50(b) motions made post-verdict are considered *renewed* motions for judgment as a matter of law, and are barred if not preceded by a Rule 50(a) motion preserving the claim. See *Mid-America Tablewares, Inc., v. Mogi Trading Co., Ltd.,* 100 F.3d 1353, 1364 (7th Cir. 1996) (the Seventh Circuit "gives effect to the plain language of Rule 50(b) by requiring that a motion for judgment as a matter of law be made at the close of all evidence in order to be preserved for post-trial consideration"). Accordingly, the court concludes Defendant waived the motion for judgment on Count II as a matter of law.

**Inconsistent Verdicts**

Even if the sufficiency of the evidence argument is waived, Defendant argues, the court should decline to enter judgment because the jury's verdict is inherently inconsistent. Defendant acknowledges that the two claims, gender discrimination and intentional infliction of emotional distress, have distinct elements. (Defendant's Response to Plaintiff's Motion for Judgment on the Verdict ("Defendant's Response"), at 3.) Defendant makes too much, however, of the fact that Plaintiff puts forth essentially the same evidence in support of each claim. *Id.* In Defendant's view, Plaintiff offered only testimony and evidence that was "arguably evidence of alleged discrimination" such that the "basis of the claims are inextricably entwined between the two theories of recovery." *Id.* at 4. While the import of this characterization is not immediately obvious, the court disagrees with Defendant's conclusion that the verdicts were inconsistent. Not all outrageous conduct is discriminatory. People may, unfortunately, treat one another horribly for any number of reasons, or for no reason at all. On that basis alone, it is evident that a jury could view one set of facts and conclude that a plaintiff was the victim of outrageous conduct designed to inflict severe emotional distress, but also conclude that the outrageous conduct had nothing to do with plaintiff's status in

6

a protected class.

The Seventh Circuit's decision in *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563 (7th Cir. 1997) supports this conclusion. In that case, plaintiff was diagnosed with bipolar disorder and maintained that he informed several people, including the vice president and general manager of the company. *Id.* at 566. Following a number of troublesome incidents, including complaints about plaintiff from the entire warehouse staff that he managed, a shouting match between plaintiff and another manager, and a breach of company policy when plaintiff left the office in the middle of the day, plaintiff announced his resignation. *Id.* Plaintiff apparently had second thoughts about the decision to quit work, but when he later returned with a doctor's note recommending that his workload be reduced, defendant promptly terminated his employment. *Id.* Plaintiff alleged that defendant fired him in violation of the ADA and that his termination amounted to intentional infliction of emotional distress. *Id.* As in this case, the jury found in favor of defendant on his discrimination claim, but awarded plaintiff damages in the amount of $150,000 on the intentional infliction of emotional distress claim. *Id.* at 567.

In *Van Stan*, it was plaintiff who argued inconsistency; the Seventh Circuit rejected his contention that the jury's favorable finding on the emotional distress count required judgment in his favor on the ADA claim. *Id.* at 571. Instead, the court observed, because different elements make up the two claims, the jury's verdict was not "per se inconsistent." *Id.* The Seventh Circuit further concluded that, as a matter of law, defendant's conduct was not extreme and outrageous and directed the district court to enter a finding in favor of defendant on the emotional distress claim. *Id.* at 572. Thus, the *Van Stan* court ultimately found in favor of the defendant, but not on the basis that the verdicts were inconsistent. Although *Van Stan* is not precisely analogous, it illustrates that a reasonable jury could have found plaintiff established the elements of an emotional distress claim, but not the elements of a discrimination claim. *Id.* at 572. Here, likewise, this court concludes the jury could have reached the same conclusion without generating an irrational or inconsistent result.

7

**Remittitur**

Although the court is not inclined to disturb the jury's verdict for inconsistency, the court has grave doubt that the evidence in this case was sufficient to warrant the award in her favor on her emotional distress claim. To succeed on such a claim under Illinois law, Plaintiff must show that: (1) Defendant's conduct was extreme and outrageous; (2) Defendant either knew that its conduct would inflict severe emotional distress, or knew that there was a high probability that it would cause severe emotional distress; and (3) Defendant's conduct in fact caused severe emotional distress. *Doe v. Calumet City*, 161 Ill. 2d 374, 392, 641 N.E.2d 498, 506 (1994). Only where a defendant's conduct was "so outrageous in character and so severe in degree as to go beyond all possible bounds of decency," will a plaintiff satisfy the first element. *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997), quoting *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 702-03 (7th Cir. 1993). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not amount to extreme and outrageous conduct, and the conduct is judged by an objective standard based on all of the facts and circumstances of a particular case. *Van Stan*, 125 F.3d at 567, quoting *Public Fin. Corp. v. Davis*, 66 Ill.2d 85, 89, 360 N.E.2d 765, 767 (1976). The Illinois Supreme Court has explained that "the law intervenes only where the distress is so severe that no reasonable man could be expected to endure it." *Public Fin. Corp.*, 66 Ill.2d at 90, 360 N.E.2d at 767.

As the Seventh Circuit has observed, Illinois courts recognize that, in the employment context, personality conflicts and job performance issues are unavoidable and frequently result in distress. *Van Stan*, 125 F.3d at 567-68. If such incidents constitute intentional infliction of emotional distress, most employees would have a cause of action. *Id*. Instead, "Illinois courts have limited recovery to cases in which the employer's conduct has been truly egregious." *Id*. at 568. For example, in *Harriston*, 992 F.2d at 703, plaintiff alleged that she was prohibited from

8

supervising two white subordinates; she was reprimanded without cause; she was not allowed to participate in a management incentive fund; she was forced out of her management position; she was denied a promised promotion; her most lucrative accounts were re-assigned and replaced with less promising ones; she was excluded from office activities; her telephone calls were monitored with an eavesdropping device; and her concerns for her safety following damage done to her personal property were ignored. Even this conduct, according to the Seventh Circuit, "was not so severe that a reasonable person could not be expected to endure it and it did not go beyond all possible bounds of decency." (*Id.* at 703.) The court affirmed summary judgment in favor of the employer on plaintiff's emotional distress claim despite circumstances arguably more egregious than presented here.

In contrast, *Pavilon v. Kafer,* 204 Ill. App. 3d 235, 245-46, 561 N.E.2d 1245, 1251-52 (1st Dist. 1990), reveals how extreme the conduct must be to meet the test. In that case, the employer repeatedly asked plaintiff, his employee, for dates and offered her money for sexual favors. Even after terminating her employment, he continued to harass plaintiff, her family, and her therapist with letters, and also interfered with her new employer by making harassing early morning phone calls, filing a spurious complaint with the Attorney General, and attempting to preempt the new employer's trademark. *Id.* The plaintiff in *Pavilon* also testified that her former employer threatened to kill her, rape her, and seek custody of her only child, and then repeated his proposition, this time in writing, to give her money in return for sexual favors. *Id.* at 241, 561 N.E.2d at 1248. The Illinois Appellate Court concluded that this conduct, cumulatively, could be sufficiently severe and outrageous to support the first element of the intentional infliction of emotional distress test. (*Id.*) In the case before this court, where Defendant made no written or verbal threats of violence, the court readily concludes that any improper conduct on Rossi's part here does not approach the level of the severe and outrageous conduct in *Pavilon*.

As noted, Defendant waived a sufficiency of the evidence challenge by failing to file a Rule

9

50 motion on the emotional distress claim before the case went to the jury. Despite the waiver, the issue of the sufficiency of the evidence supporting that claim remains relevant to the propriety of the jury's damage award. The Seventh Circuit has directed courts to consider three factors when considering whether a compensatory damages award warrants a new trial or remittitur: (1) whether the award is "monstrously excessive;" (2) whether there is a rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases. *Merriweather v. Family Dollar Stores*, 103 F.3d 576, 580 (7th Cir. 1996). The court is disinclined to characterize the verdict here as "monstrous." As explained below, however, the court struggles to find a rational connection between the award and the evidence, when compared with such awards in other cases.

The court looks, first, at the relationship between the evidence of distress and the award. Plaintiff testified that following her termination, she was "totally disillusioned," "devastated," "depressed," "in despair," and "scared to go out and get a job hooked to a union." The jury evidently found that this amounted to severe emotional distress. The court notes its concern whether Plaintiff's reaction was a response to outrageous conduct by Defendant. As Plaintiff testified, Defendant terminated her promptly after it issued her a third warning notice in the span of one year for admitted infractions of company policy. In light of the fact that Plaintiff lost her house in foreclosure proceedings sometime shortly before her termination, it appears that at least some portion of the stress she experienced could be attributed to something other than Defendant's conduct. Again, Plaintiff's own conduct leading to her termination is not disputed, and the only evidence of her emotional distress related to her reaction to being terminated. Under these circumstances, the relationship between the substantial award in Plaintiff's favor and Defendant's conduct is tenuous.

Even when the court considers Plaintiff's other complaints about Defendant, the connection between the verdict and the evidence remains uncertain. Plaintiff claimed that her fellow male

10

employees who also violated company policy were disciplined less severely or less consistently, if at all. She further complained that although Defendant usually gave her time off when she requested it, Defendant refused her request to be excused from work on April 1, 1995. According to Plaintiff, Defendant assigned male co-workers with less seniority to work more frequently than her, and failed to repair the brakes on her truck despite her repeated requests. Ultimately, Plaintiff admits, Defendant provided her with a new truck to drive and assigned the faulty one to a male driver. Yet Plaintiff did not attribute her severe emotional distress to these actions, nor did she offer evidence that Defendant should have known these actions were likely to cause Plaintiff severe emotional distress. Even if she had connected those events to her emotional distress, the court would have difficulty seeing a rational relationship between the evidence and the award.

In addition to its concern regarding the relationship between the evidence and the award, the court has concern regarding the size of the award in this case. When compared with damage awards in other similar cases, the $125,000 award here appears excessive. For example, in *Merriweather v. Family Dollar Stores of Indiana, Inc.*, 103 F.3d 576, 578 (7th Cir. 1996), plaintiff charged defendant with race discrimination in denying her promotions, and with retaliating against her by firing her after she filed her a discrimination complaint. Plaintiff Merriweather produced evidence that her employer told her she had no opportunity for advancement despite her significant educational qualifications and several years of relevant experience. At the same time, defendant hired white employees with less experience and qualifications for positions higher than plaintiff's and paid them more. *Id.* at 578-79. After she filed a discrimination complaint, plaintiff was denied a pay raise on at least two occasions, while all other employees who, like plaintiff, had worked at the store for at least five months received at least one pay raise. *Id.* at 579. Plaintiff met with the store manager and district manager because she believed she had been short-changed on a paycheck, and following heated discussions with each of them, the district manager asked her what she intended to do with her discrimination complaint. *Id.* Plaintiff refused to discuss the matter, and the

11

district manager immediately terminated her employment. *Id.* After a bench trial, the district judge concluded there were legitimate, non-discriminatory reasons behind defendant's decision not to promote plaintiff or give her a raise, but found that she was discharged in retaliation for filing a discrimination claim and awarded her $25,000. *Id.* at 580. In light of evidence that other factors, including the death of her father and eviction from her apartment, contributed to the emotional distress for which she had sought counseling, the Seventh Circuit remitted plaintiff's compensatory damage award to $6,250 (25% of the original award). *Id.* at 581.

Significantly, in *Merriweather*, the court awarded compensatory damages for the emotional distress plaintiff suffered as a result of violation of Title VII. In some instances, when, as in *Merriweather*, the emotional distress constitutes a claim for damages rather than an independent tort, the Seventh Circuit has affirmed more substantial awards. Thus, in *Tullis v. Townley Engineering & Manufacturing Co.*, 243 F.3d 1058 (7th Cir. 2001), the court upheld an award of $80,000 where plaintiff presented evidence that he was fired in retaliation for filing worker's compensation claims for an on-the-job back injury. *Id.* at 1061-62. Although defendant countered that plaintiff was fired for failing to report to work on more than three consecutive days, the jury apparently credited plaintiff's version of the events, including his account of the emotional distress he suffered due to the discharge. *Id.* at 1061, 1066. Plaintiff testified that he "felt 'low' and 'degraded' by his employer's conduct . . . and 'back-stabbed' when the company opposed his [claim for] unemployment compensation." *Id.* at 1067. He further testified about his resulting financial difficulties: Out of work for almost ten months, plaintiff had trouble paying bills, he borrowed money from family and friends, and he was unable to buy new school clothes for his children. *Id.* The Seventh Circuit found this evidence sufficient to warrant the $80,000 damages award. *Id.* at 1068-69.

The *Tullis* court contrasted the circumstances before it with those presented in *Avitia v. Metropolitan Club of Chicago,* 49 F.3d 1219 (7th Cir. 1995). In *Avitia*, plaintiff, a waiter, claimed that

12

he had been fired in retaliation for informing an auditor that he had not been paid at the overtime rate for the overtime hours he worked. 49 F.3d at 1226. The jury awarded plaintiff $21,000 for the emotional distress he suffered as a result of the retaliatory termination. *Id.* at 1228. On appeal, defendant urged that plaintiff had not established emotional suffering serious enough to warrant a damage award. *Id.* The Seventh Circuit pointed out that, in contrast with the high threshold that a plaintiff claiming intentional infliction of emotional distress must meet, there is no threshold level of distress for compensatory damages based on a wrongful discharge. *Id.* at 1228-29. The court nevertheless concluded that the $21,000 award was out of proportion with plaintiff's injury. *Id.* at 1229.

Notably, in *Avita*, as here, plaintiff focused on his emotional reaction to being discharged. He testified that when he was fired after thirteen years of dedicating "all of [his] energies . . . to this job," he felt as if he had been thrown out "like a piece of . . . garbage." *Id.* at 1227. On the day of his termination, he was "speechless" and went home and cried. *Id.* Urging that "judges and juries must not be casual with other people's money," the Seventh Circuit predicted that if the $21,000 award were sustained, future plaintiffs with retaliatory discharge claims would testify to such similar, essentially irrefutable distress and the *Avitia* plaintiff "will have furnished the script for countless plaintiffs in suits for wrongful discharge." *Id.* at 1229. Should that happen, $21,000 would "tend to become the floor for the award of nonpecuniary damages in such cases." *Id.* To avoid such a result, and because plaintiff's injuries did not warrant $21,000, the Seventh Circuit reduced the award to $10,500. *Id.* at 1230. Thus, even where the threshold for recovery is much lower than in the instant matter, the court reduced a much lower award by half. *Cf. Fleming v. County of Kane*, 898 F.2d 553 (7th Cir. 1990) (affirming reduction of $120,000 award to $40,000 for "whistle-blower" whose wife and doctor testified that he suffered depression, sleeplessness, and headaches from job stress); *Peeler v. Village of Kingston Mines*, 862 F.2d 135 (7th Cir. 1988) (affirming a $50,000 award to plaintiff police officer who suffered retaliation after arresting the village mayor, where there

was evidence that negative publicity defeated his effort to find a job; that his family was evicted from their home, and had no food, clothing, diapers or medical care; and that plaintiff himself suffered serious medical difficulties).

## **CONCLUSION**

The court recognizes that the cases discussed in this opinion are not precisely analogous to the circumstances presented here. Notably, however, even in cases where juries have awarded damages for the emotional distress flowing from other violations, an award of the magnitude in this case is rare. The court concludes that an award of $125,000 in these circumstances is not rationally related to the evidence presented at trial and is inconsistent with awards in other cases. Accordingly, the court orders remittitur of the damages awarded to $25,000. Within 21 days, Plaintiff is directed to advise the court and Defendant of her willingness to accept the reduced amount; if she declines, the court will conduct a new trial at the next available trial setting.

A status conference is set for Wednesday, August 7, 2002, at 9:00 a.m.

ENTER:

Dated: July 16, 2002

REBECCA R. PALLMEYER
United States District Judge